Oh, I'm sorry. Mr. Corey. I'm here. I'm sorry. May it please the Court, Charles Corey for Mr. Jimenez. I'm nervous, and I shouldn't be. I've been doing this work for 45 years, 45 this June. Why are you nervous? I'm nervous because my strongest issue is not certified. And that really makes me nervous. That is the strongest issue in this case. And I now I might have gotten into trouble with the panel, I hope I didn't, in making a motion to try to get you to say, yes, it's going to be certified. The problem is that since we don't meet beforehand, it's difficult for us to do that. I mean, go ahead and argue. And the bigger problem is that the government is not really on notice about that. I know. And has not briefed it either because it's their prerogative not to brief it. So I would suggest that you, I guess I would suggest, my colleagues could suggest otherwise, that you start with the certified issue, leave yourself some time. You can say something about the uncertified issue, and if we want to go forward with it, we would have the government brief it. We would probably not have another argument, but we would have the government brief it. That's what makes me nervous, because the certified issue is a result of the ineffective assistance of this trial attorney. They are linked. And like I said, I've been reading transcripts. My first job out of law school was research attorney for the Court of Appeal. It was in the days when law students, recent graduates, got that job. They don't do it that way now in their career, but it was much better that way. It's not true here. We just have to cover it. It's not true. Excuse me? And it's not true in this court that they're here. No. They're not. But at any rate, I was right out of law school. Anyway, I suggest you go to your argument. I'll go to my argument. But it was in reading the transcript that I saw just how this attorney, and I'll leave it at that. No, I won't leave it. I'll come back to it. He took a dive. I'm sorry. He took a World Cup soccer player dive, except when you do it as a soccer player in the World Cup, there's a benefit. You get a penalty. I don't know what the benefit. There was no benefit. It was a terrible prejudice to his client here. So the point is that, and as I argued in the certified issue, is the voluntary intoxication. The judge handed that issue to the defense in the concept of negligent discharge of a firearm. I put it in my brief. I copied it word for word out of the transcript. The judge, the trial judge said they were playing around with a gun. If you're, you know, I'll have to instruct on that. And the defense attorney said no. But this is your uncertified issue. I know, but it's also because of the drunkenness. The certified issue was voluntary intoxication. He had to raise that and to say, the R&R to say there was no evidence of voluntary intoxication. That's almost fraudulent. They were reading a different record than I was reading. I'm sorry. Drunk, stupid drunk. They were described as stupid drunk by Peter Altamirano. He was there. Stupid drunk. 30 cans of beer consumed by three people and it's 2 o'clock in the morning and that's all they were. They were stupid drunk. This was a terrible, tragic accident that happened due to stupidity and booze. And the jury never got to decide that. So you want to claim ineffective assistance of counsel. I do. But what do we have to work with? I mean, do we have anything from counsel with regard to the decisions that were made as to what defenses to pursue? This was all pro se. That's real hard. Well, but I hear you, but that means there's not much to work with now. We don't have to. You know why? Because it's so outrageous. Well, no. I hear lots of cases. We get a good number of cases where a defendant decides to gamble at getting off entirely and doesn't want to put himself in line for a lesser conviction. In this case, if he starts saying, well, it all happened because I'm drunk, then there's no chance he's going to get off entirely. So maybe he decided to roll the dice. Now, that seems unlikely, but I can't say it's unthinkable. And right now we don't seem to have any kind of record that would support an effective assistance claim. There has to be rational. What you're talking about is rational tactical decisions. I've watched a good number of defendants say, I want to roll the dice. Well, this is – there's nothing on the record here and except the – But isn't that your client's problem? There's nothing on the record. No, my problem – no, there's nothing on the record except the judge's incredulity. The trial judge's – the trial judge was incredulous when Mr. Ingber said, I don't want an instruction on second-degree murder. He was incredulous. Wait, wait. You mean, you know, he could not believe it. You're going on record for doing that? The prosecutor, to save his case from reversal, jumped in and said, no, you've really got to instruct that, Your Honor. But, Your Honor, all I have to do to tell this panel is to read the closing argument of this defense attorney. I've told you, I've been doing this for 45 years. I have never seen a closing argument that bad, that unfocused, and that designed to get someone convicted. I don't need anything else. I don't need a declaration from Mr. Ingber. All I have is the record. And that shows counsel, this is actually – and I fault myself – this is a chronic case. A C-R-O-N-I-C. You know what I'm talking about, where the representation is that bad that it's reversible per se. Well, a chronic case is a case where there's a conflict and there isn't. Well, but it was also a young attorney, a young attorney, who did – who had never – the facts are, he had never tried a case like that. And he basically – Are you going to talk about the injunctions – the instructions at all or not? I am going to talk about the instructions. And they were so muddled, and I put it in my brief, where the prosecutor equated first and second – implied malice with malice, said it doesn't make any difference. And of course it makes a difference. He gave the jury the wrong impression. And to his credit, when the jury came back and said, we don't understand – and this is all in the record. I'm not making this up. The jury wrote a note back saying, we don't understand the difference between first and second degree murder. This was after argument. Wasn't the original instruction, though, right out of the book? The original instruction, the jury didn't understand after argument because the prosecutor messed it up. And I put it all there in my brief how he erroneously said that you can get to first degree with implied malice. He said it. I'm sorry. And to his credit, when the jury came back with this question and the judge says, well, I'll just give them instructions again. And the prosecutor said, no, Your Honor, don't do that. They already have the instructions. Let's re-argue it. And my client's attorney said, no, no. That's not – that's not working for your client. They had to do something other than give the same instruction to the jury that they didn't understand, especially after the muddled argument, an erroneous argument by the prosecutor in this case. And the defense attorney put the kibosh on that. He said no. So do you see what I mean about how these are interrelated? The ineffectiveness is interrelated to what happened. That's why the jury instructions were messed up, because defense attorney didn't jump in, because the defense attorney objected to second degree murder. Because defense attorney – okay, go ahead. But it's all uncertified. I know, and it shouldn't be. I have to convince you to certify this and to give my esteemed opposition a chance to brief it. It's so important. I don't – what hurts is that, you know, it's so – it jumps right out at you reading the transcript. I put it in my brief. Since you don't want to argue about the instruction. I do. But you haven't. I do. I'm relating it. What the court's missing is that they're intertwined. Sometimes you can't separate them. Okay. The reason the jury didn't understand, the reason the jury didn't understand was because of the prosecution's argument, which said they're the same, and that's what he did. Now. All right. Sorry. He should have objected, shouldn't he? And you know what the – sorry. The Court of Appeal said – the Court of Appeal said, well – and I quoted it on page 11 of my brief. It was sort of an unbelievable thing that the California Court of Appeal said, well, true, yeah, he did say this, but we know that the – you know, I don't think it does justice for me to paraphrase it, because it's really – it's really nuts. The California Court of Appeal, they said they concluded – this is a quote – the prosecutor's words are ambiguous at best. Okay. They were more than ambiguous. They were wrong. And, quote – this is the Court of Appeal – if defense counsel had heard what appellant now claims was stated – not claiming it, it was stated – an objection surely would have followed. The cold record devoid of voice inflections and emphasis supplies more substance to appellant's argument than it deserves. Excuse me. Do you see how they're related? Of course he should have objected. He should have jumped up and been on his feet and said, that's misstating the law. But he didn't. He was a potted plant. He was worse than a potted plant. Can you tell me what – to change the subject a little. What is the exact evidence in the record with regard to their being drunkenness? This is Peter Altamirano testifying in front of this jury. They were stupid drunk. Is that it? No, no. Thirty cans of beer consumed. Is that what he said? Who said that? Oh, it was several witnesses said. Over what period of time? How many people? What's that? Over what period of time and among how many people? It was three people. And it was like from, oh, maybe over a three-hour period. That's enough to be stupid drunk. How do you square that with the evidence in the record that when right after the shooting there was an apparent attempt by the defendant to make it appear as if this had been self-defense? No. It's not – it doesn't sound like somebody was either stupid or drunk. It was awful what he said, but I'll tell you what he said. He said – it's what a stupid drunk person would say. Well, he said, what would you do? He said, shoot, pull the trigger. Dick, pull the trigger. These were friends. These were friends. And they were screwing around with a gun. And that was so clear that they were playing with a gun. They were playing with it. He said, I had to do it. Yes, I had to do it. What would you do? No, I had to do it because he's macho drunk and his friend said, hey, Dick, pull the trigger. Go ahead, shoot me. Only stupid drunk person would do that to his friend. Okay? That's just life. Let me just ask you one question. The – is the voluntary intoxication defense the core of your IAC claim or is there more to it? There's more to it. Okay. And it is? It is the opposition to the trial judge who was ready to give an instruction on gross negligent discharge of a firearm, which is second-degree murder. He opposed it. You don't do that. When the judge says, I'm going to give you that instruction, you don't say no. There's no evidence of that. Excuse me? And the judge said, okay. You're the defense attorney. He was the defense attorney in name only. I know I'm a little emotional about this. I'm 75. I shouldn't get this emotional. But it really got me angry reading this transcript. That's my apology to the Court. It's there. What's the importance to your argument of the argument of defense counsel? His closing. Because there was no – the jury had – It was awful. It was a little bizarre. It was. It was. And actually, he made it worse by when the prosecutor says, this is a bad-ass defendant who wanted respect. And the defense attorney gets up. Well, I'm pretty bad-ass myself. Excuse me? What was that about? That's more than bizarre. So my question is, what is the effect or role of that in your argument? The effect is that the attorney was so ineffective that he actually was arguing against his own client. That's about as ineffective as you can get. I can't really – I can't emphasize it anymore. And so I was right to be nervous because that's why I – it was actually the chief judge who said, if you want to find out if your uncertified issue is going to be certified, do – a week before, you'll find out who's on the panel. Fire off a motion. So it was just the chief judge. He came and gave us a lecture to all the people on the panel just a few months ago. And that was raised. You know, what do you do when it's – when your strongest issue is uncertified? How do you prepare for that? And he said, pass the panel. And I did. So – and that's what I was doing. But I can't emphasize anymore how this – this is such – this goes through the whole case. Okay. Yeah. And we'll give you a minute to revile. Thank you very much. Thank you. Thank you. Good morning. May it please the Court, Deputy Attorney General J. Michael Lehman on behalf of Respondent Appley, Warden Ralph Diaz. We will not be addressing the uncertified issue, as is our policy. Three points I'd like to make. First of all, this is a due process via instructional error claim. So the first relevant question is we have to look at the entirety of the instructions. And were the instructions even incorrect, looking at the entirety of the charge? And it's our position that if you look at the entirety of the re-instruction, not just the two sentences that Petitioner would like us to focus on, as well as the initial charge, as well as the written instructions that were given to the jury, that the jury was correctly instructed as initial matter, much less a due process violation. Our second point is that this is, after all, an AEDPA case, and Petitioner has not shown that the California Court of Appeals' opinion was an unreasonable application of clearly established Federal laws determined by the United States. And then third, there's the obvious BRAC-slash-FRI issue that Petitioner has not shown a substantial and injurious effect on the verdict by any alleged error. And unless the Court has any other questions. Kagan. Oh, you're proposing to stop now? We will, unless you have any questions. Well, I do. I have many. Oh, please. I was simply. I was half expecting to be interrupted, so. First of all, why does it not have an effect on the start of the back end? Tell me why it didn't have an injurious effect. We're going to the. I mean, the instruction, the re-instruction was, could certainly be understood, could it not, as saying that you didn't, you could have first-degree murder with implied malice. No? No, I don't believe it could. Okay. So perhaps I can address that initially before we get to the FRI issue. Whether it had to be is another question, but could it be? No, no. Why not? The entirety of the claim focuses on two sentences in the initial re-instruction, and that's to be found at page 17 of our brief, which in turn is quoting ER 981 to 985. Now, Petitioner focuses on two particular sentences which are not even instruction. They're directional sentences. Now, keep in mind what the trial court asked, or excuse me, what the jury asked the trial court was, it said in essence, we're not getting the distinction between first-degree murder and second-degree murder. Help us out with some more simplified instructions. Now ---- It starts out for some reason with there are two kinds of malice aforethought, which is not the distinction between first-degree and second-degree murder. No, no. It starts out the court and the parties, including Petitioner's trial counsel, decided that before we get to first- and second-degree murder, we've got to re-instruct them with murder, which is Calgic 8.10. And if you look at page 17, that's the first portion before we get the italicized. And then the parties also agreed that it was important to give malice aforethought again, just to get murder out there, because, again, there was no felony murder theory. There were no felony murder instructions. So the trial court is giving these instructions, and it's saying directionally, essentially, to the jury, I know you've asked me about first-degree murder. I know you've asked me about second-degree murder. But it's important that you understand these concepts of murder and malice aforethought. So bear with me. I'm going to get you to this first-degree, second-degree murder business. But here's the definition of murder. Here's the definition of malice aforethought. And, again, there are two transitional directional sentences, if you will, pathways that Petitioner wants to focus on. But right after that, right after that, the trial court then proceeds to give Calgic number 820, which is deliberate and premeditated murder. And, again, that's to be found at ER 985-988. Right after that, it gives Calgic number 2.0, which is unpremeditated murder with an intentional killing. And if I can direct the Court's attention to page 28 in our brief, in case there was any confusion after those Calgic instructions, the Court specifically said the following. So if you have an issue about that, you go back and look at the definition of premeditation, willful, and deliberate. Down at the bottom of the next paragraph, the trial court summarizes as follows. The definition is in the instruction, what that means when the perpetrator intended to unlawfully kill a human being. But the essence of second-degree murder, the evidence is insufficient to prove the deliberation and premeditation. So, once again, you go back to what deliberation and premeditation means, legally speaking, if that's an issue. So if all the jury had was just that, hearing that in the re-instruction, it would be clear. You could not have first-degree murder without premeditation, willful, deliberate. The trial court says it to the jury twice. Go back and look at that instruction. That's 8.20, if you're unclear on that. But that isn't all it had, of course. It had written instructions sent back with it. And the California Court of Appeals specifically held that it was implausible was the word it used, to think that the jury would have taken those two sentences out of context from the initial part of the re-instruction and ignored the written instruction and went back to the jury room with, and somehow come out with first- degree murder without premeditation. Which leads me to my second point, that this is, after all, an AEDPA case. And we do have holdings and findings, and there's nothing unreasonable about those findings. And then third, as for the prejudice portion, the evidence was pretty clear that what we have was premeditated murder. We have two of the three of California's Anderson factors for first-degree murder. We have both manner of killing and we have motive. Manner of killing, the evidence was this. Petitioner took the gun, had it six inches away from the victim's head. Victim says, go ahead, Dick, pull the trigger. The coroner told us that the entry wound was right in the middle of the forehead. That's manner of killing. That's one of the two Anderson factors in California for first-degree murder. They're not elements, they're just factors to consider. The second one is a motive. Well, somebody could certainly conclude, could they not, that he didn't premeditate anything until he said, go ahead, Dick, pull the trigger. And at that point, that he wasn't trying to kill him, he was just trying to pull the trigger. I mean, reckless disregard, sure. Well, he was trying to pull the trigger when he had the gun. That's actually much more plausible than the opposite. The notion that he was trying to kill him at that point seems fairly unlikely, actually. It seems to me that if you've got a gun six inches from a fellow's forehead. But that's the difference between second- and first-degree murder, right? Are you trying to kill him or are you? Well, but that's just it. The jury was also instructed, pursuant to Section 189 of the Penal Code, that there isn't a need for meaningful reflection, that premeditation does not require meaningful reflection. So it's not. But it does mean that you have to intend to kill him as opposed to you know you would kill him, but that's not what you're trying to do. I'm sorry? As I understand, at least, the difference between implied malice and expressed malice. Oh, you're talking about implied, okay, I see. Right? Yeah. The difference is whether any idiot would know if you pull the gun and shoot him in the head if he's going to die, but that's still just implied malice, right? Well, I think you can infer that if, in the normal course of events, if you hold a gun six inches from someone's forehead. But that's implied malice. No. Why? Because you can, it's circumstantial evidence of an intent to kill. Because there's no other outcome? Yes. That's sort of the comment. I've never seen it. I can honestly say I've never seen a murder case in the 12 years I've been doing it where the person actually. This is a very strange murder case. It's very odd in numerous reasons, numerous. But even if that weren't enough, we have, as Judge Rosenthal had indicated, the post-murder statement, which is when Mr. Rodriguez, the neighbor who knows everybody, comes out, hears the gunshot and says what's going on, his immediate reaction is I had to do it. What would you do? Which, again. Pull the trigger. Which is sort of a half-hearted self-defense. Can you respond? That's right. Can you respond? I know you don't want to address ineffective assistance, but can you respond to the argument in this context that that is as much an indication of someone who is just too drunk to understand what's going on and is being incredibly young and stupid as a result, but, and not so much an inference, and does not support an inference nearly as convincingly of an effort to manufacture self-defense when there were too many witnesses to make that plausible anyway? Well, there's no – manufacturing self-defense doesn't mean you have to be a bright guy. No one's saying Petitioner was a particularly bright fellow. There's nothing inconsistent with saying the man's 20 years old. He's very immature. He might have had a few beers. The evidence was they had a few beers. And that you also premeditated because you got your backup because, again, I don't think we've talked about this. Earlier in the evening there had been this white truck that had driven by the second time with its music blaring. Petitioner apparently felt disrespected by this. He particularly felt disrespected by the fact that as the men were all standing on the curb towards the street, the truck apparently came close enough to almost knock him down. When you add this to the statement of, go ahead, Dick, pull the trigger, the idea is we have motive. And, again, he got his backup. Whether he'd been drinking, whether it was an immature act, whether it was – I think we can all agree it was an extremely immature, horrible way to act. That doesn't mean it doesn't meet the test of premeditation. But you're suggesting that his words support an inference of manufactured self-defense, and the argument made by Appellant's counsel is, no, that supports an inference of stupid drunk, and that's it. Well, my understanding of stupid drunk is you can barely speak. At least that's been my experience with the phenomenon. I'm not sure – that may be stupid. It doesn't necessarily mean stupid drunk. I'm not sure how that supports voluntary intoxication at all, or that even drinking would affect the statement. But did the defense counsel argue second-degree murder in his closing argument? The defense counsel took what Judge Glifton was talking about, and that's sort of the all or nothing. Right. It may or may not have been a good idea. I don't know. This was a tough case for counsel. Here's what you had. You had a witness who said the man held the gun to the victim's head six inches away. You have a coroner who says it came right through here. You have a second witness, Ginzmo, Ginzo or Gizmo, Ginzo I believe is his name, who corroborated the first witness. So the defense counsel did a very difficult job. What he chose to do was this. He said, well, look, this Altamirino, the prosecution's main witness, told three different stories. First he tells the cops it's a drive-by, gangbang drive-by shooting. Then he says, well, you know what, we're all horsing around. We're having some drinks. We're screwing around with a gun. The next thing you know it goes off. Then he comes to court. Oh, by the way, Mr. Altamirino comes in county blues because he's been picked up for carrying a concealed firearm. So this guy, all of a sudden his story is that he shoots in a close range. Are you going to believe that? That was essentially defense counsel's argument. He also pointed to the neighbor, Mr. Rodriguez, and said, well, you know, he has a felony, and you can use that against him. Maybe he wasn't telling the truth. Was it a good argument? I don't know. You know, defense counsel was very good. We know it didn't work, and we know it's an uncertified issue. Well, but it relates to the second. It relates to the harmless error on the second degree murder on the instruction as well. Does it? Well, to some degree. I mean, if it wasn't arguing the second degree murder, it makes it a little less likely that it was harmful. That's why I was asking you. Well, it could be. Or it could be the facts were so obvious that it was first degree murder that it was confusing to the jury why you've been asking me this. Or it could just be that the concept of premeditation, on the one hand, when you determined it was intent to kill, is a little confusing, especially when you tell the jury. Except that there is a line between express malice and implied malice. There is. I actually thought the better argument would have been that the jury had found intent to kill, but not premeditated. I mean, I suppose you could try to go with the implied malice. I just think if you put the gun to a guy's head, it's pretty clear you know what you're doing. For ordinary people, but they didn't seem to be very ordinary people. Well, I think they were more experienced with guns than you or I. I don't know your background, but certainly more than I. Certainly than I. Okay. Anything else? Unless the Court has any questions. Thank you very much. Thank you. At no point, at no point did the judge in his re-instruction tell the jury that second degree murder requires implied malice and first degree murder requires express malice. At no point he never said that. And as far as the ---- What's wrong with what he did say? What's wrong with what he did say? He further muddled it by never pointing that out. And I quoted it in my opening brief. He did not correct at all the impression, the statement by the prosecutor that they were both the same. He didn't correct it. Now, I have to point out, as a cost-cutting measure, I think, but I don't know why, the record shows there was only one set of jury instructions for these 12 jurors. That's outrageous. I'm sorry. One set. Okay. I just throw that out because they all didn't. That's what's in the record. Number two, as far as EPA, it is unreasonable for the Court of Appeal, who had that record, the same record that you have, the same record that I have before them, to say that defense counsel, if it had been the error of instruction that I'm arguing in the certified issue, if that really was the way I say it was, defense counsel would certainly have jumped up and objected. We know this defense attorney was a potted plant. And I say that very easily. I've done trial work. I've done appellate work for a long time. I have never seen such a dive. And I'll leave it with you. Thank you very much. Thank you both for your arguments. The case of Jimenez v. Giaz is submitted. We'll go to the floor.
judges: Rosenthal, BERZON, CLIFTON